# United States Court of Appeals
## For the First Circuit

Nos. 22-1134
    22-1135

PETER MARCUS, on behalf of himself and others similarly situated; MATT KOLTNOW, on behalf of himself and others similarly situated; DIANNE BARTON-PAINE, on behalf of herself and others similarly situated; ERIC BELL; JENNIFER CARMICHAEL; SUSAN S.M. DOE; HARRY FALK; JOHN GRAM; ARLEEN HARVEY; JEFFREY A. JACOB; CANDACE S. KOSCHNER; TERRY LAVENDER; KARL P. MILLER, JR.; MCKENZIE MYERS; JOAN M. PARADEIS; KENNETH VAN CLEVE; NANCY R. WATKINS; MARILYN WELLS; LYNN YOKEL,

Plaintiffs, Appellants/Cross-Appellees,

v.

AMERICAN CONTRACT BRIDGE LEAGUE,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Kayatta, Howard, and Montecalvo,
Circuit Judges.

Raymond Dinsmore, with whom Peter Goselin, The Law Office of Peter Goselin, and Hayber, McKenna & Dinsmore, LLC were on brief, for appellants/cross-appellees.
Paul E. Prather, with whom Melissa L. McDonagh, Francis J. Bingham, and Littler Mendelson, P.C. were on brief, for appellee/cross-appellant.

---

August 14, 2023

---

**MONTECALVO**, <u>**Circuit Judge**</u>.    Peter Marcus originally brought this action against the American Contract Bridge League ("ACBL"), where he was formerly employed.    In the amended complaint, Marcus and his co-plaintiffs sought unpaid overtime wages that they claimed were due under the Fair Labor Standards Act ("FLSA").    <u>See</u> 29 U.S.C. § 207(a).    Marcus also claimed that he was wrongfully discriminated and retaliated against for requesting such pay.    ACBL and plaintiffs both sought summary judgment on the wage claims, and ACBL sought summary judgment on Marcus's retaliation claim.    ACBL asserted that plaintiffs were exempt from the overtime requirement because they were properly classified as administrative employees under the FLSA.    The plaintiffs countered that their primary duties did not involve managerial work sufficient to satisfy the exemption.

Based on facts it deemed undisputed, the district court concluded that the administrative exemption applied to five classifications of employees because their primary duties related to ACBL's management or general business operations, and that those employees were not entitled to overtime pay; accordingly, partial summary judgment was entered for ACBL.    The court also concluded that one classification of employees was not subject to the administrative exemption and that those employees were entitled to overtime pay; accordingly, summary judgment was entered for certain plaintiffs. As to Marcus's retaliation claim, the district

court entered summary judgment for ACBL because it found that Marcus failed to show that any adverse employment action taken against him was causally connected to him seeking overtime wages. These cross appeals follow.

## I. Statutory Background

The FLSA requires certain employers to pay their employees at least "one and one-half times the regular rate" for any hours worked in excess of a forty-hour workweek. 29 U.S.C. § 207(a)(1). Exempt from this overtime requirement is "any employee employed in a bona fide . . . administrative . . . capacity." Id. § 213(a)(1). An employer seeking to establish that an employee is exempt under the "administrative" exemption must show that: (1) the employee's salary is at least $684 per week; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

When considering whether the administrative exemption applies, the first determination is what an employee's "primary duty" is. "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of

duties; the amount of time spent performing exempt work; [and] the employee's relative freedom from direct supervision." Id. § 541.700(a). However, "an employee's 'primary' duty is not determined solely by the amount of time [they] devote[] to the different categories of tasks -- i.e., exempt vs. nonexempt -- but on the overall character of [their] position." Marzuq v. Cadete Enters., Inc., 807 F.3d 431, 436 (1st Cir. 2015); see 29 C.F.R. § 541.700(a) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.").

Assuming the salary criterion of 29 C.F.R. § 541.200(a) is met, once an employee's primary duty is established, the operative question then becomes whether that primary duty is "work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a). "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business." Id. The employee's primary duty also "must include the exercise of discretion and independent judgment with respect to matters of significance." Id. at § 541.202(a). If all of these criteria are met, then the employee is exempt and not entitled to overtime pay.

## II. Factual Background

ACBL is the largest bridge organization in the world, with over 162,000 members. ACBL's mission is to "promote, grow and sustain the game of bridge and serve the bridge-related interests of its members" throughout the United States, Canada, Mexico, and Bermuda. ACBL divides its geographical reach into twenty-five districts, and each district is divided into a varying number of units. In furtherance of its mission, ACBL sanctions bridge tournaments at three different levels: sectionals, which usually involve only one unit; regionals, which usually involve one district; and the North American Bridge Championships ("Nationals"), which are held three times a year and involve all districts. While Nationals are sponsored and run by ACBL, regional and sectional tournaments are not; ACBL does provide staff "to direct and support the [regional and sectional] tournaments and will bill the tournament sponsor."

### A. Relevant Job Positions at ACBL

The job titles assigned by ACBL to their employees relevant to the instant appeal are Tournament Director, National Tournament Director, Associate National Tournament Director, Field Supervisor, Area Manager, and Mentor. Tournament Directors "act as a referee for the games played at the tournament to ensure they are played fairly and with integrity for all the players in accordance with the Laws of Duplicate Bridge." Tournament

Directors may, inter alia, rule on disputes, enforce and maintain discipline among players, keep and verify the accuracy of scores, ensure timely play, and penalize players via the deduction of points or ejection. Tournament Directors are also responsible for setting up the tournaments and selling entries.

The number of Tournament Directors present at a given tournament varies depending on the level of tournament, but every tournament has one Tournament Director who serves as the Director-in-Charge ("DIC"). The DIC role is typically filled by a full-time ACBL employee who is responsible for determining how many Tournament Directors are required for a tournament and supervising those Tournament Directors and other tournament staff.

Tournament Directors are also assigned ranks based on their experience and skill. The rank determines what level of tournament the employee can oversee as a DIC. All full-time Tournament Directors hold the rank of (from junior to senior) tournament director, associate national tournament director, or national tournament director. Generally, the DIC must have the rank of (1) at least tournament director for a sectional tournament; (2) at least associate national tournament director

for a regional tournament; and (3) at least national tournament director for Nationals.[1]

Field Supervisor was a position in existence prior to January 2018, primarily responsible for tournament organization, operations, and directing. Tournament Directors reported to Field Supervisors, and Field Supervisors were responsible for hiring and firing decisions, as well as promotion, demotion, recruiting, training, and development of Tournament Directors. Field Supervisors assigned the DIC for sectional and regional tournaments and completed performance reviews for the Tournament Directors they oversaw. At tournaments, Field Supervisors refereed game play while also supervising and providing feedback to their direct reports.

In early 2018, ACBL reorganized its Field Operations department: it eliminated the Field Supervisor position and created four new positions. The duties of the Field Supervisor position were rolled over to the newly created Area Manager position, except that Area Managers have responsibility over more districts and perform special projects. Area Managers are the

---

[1] We agree with the district court's observation that "ACBL uses a somewhat bewildering variety of job titles and rankings." For example, "Tournament Director" is seemingly used as a general term for those who oversee tournaments, a job title, and a specific rank. Likewise, National Tournament Director and Associate National Tournament Director are seemingly job titles within ACBL as well as ranks of tournament directors.

"first point of contact" for issues relating to the operation of tournaments and the setup of games, and they interpret and implement game rules, manage the flow and pace of gameplay, and resolve disputes, including appeals made by players concerning the rulings of other Tournament Directors.  Area Managers also make employment decisions, including hiring and firing, assigning DICs, and writing annual performance reviews.

Mentor was another position created in the 2018 reorganization.  This position only existed from January 2018 to June 2019 and was responsible for the recruitment, training, and promotion of Tournament Directors.  Mentors directly answered Tournament Directors' questions, checked their hours, and gave performance reviews.  Mentors could also serve as a DIC at large tournaments and work directly with Area Managers to make tournament staffing decisions.  Although Mentors did not have the authority to fire employees, their recommendations as to employment decisions were generally deferred to.

The final two positions that came into existence because of the 2018 reorganization are National Tournament Director and Associate National Tournament Director.  These employees are responsible for managing large tournaments and associated staff; training and mentoring other directors in making rulings, game setup, and scheduling; guiding disputes concerning game play and

poor behavior, including through the appeals process; and drafting regulations.

### B. Compensation

#### 1. Tournament Directors

In 2014, the only relevant position in existence was that of Tournament Director. At that time, ACBL asked its legal counsel to evaluate whether full-time Tournament Directors were properly classified as exempt under the FLSA. ACBL was advised that it had a "solid argument" that full-time Tournament Directors were exempt pursuant to the FLSA's administrative exemption; ACBL thus continued to treat those employees as exempt from overtime pay requirements. ACBL was also advised that employees who typically acted as DICs "almost certainly would qualify as exempt."

#### 2. Department of Labor Investigation

In 2014, Marcus -- a full-time salaried Tournament Director -- filed a complaint with the United States Department of Labor ("DOL"). Marcus alleged that he had been misclassified as an exempt employee and was entitled to overtime pay. A DOL investigator concluded that "tournament directors in the field" were not exempt because "they did not supervise employees, did not have any authority to hire, fire, or discipline or make those recommendations, and did not have management as their primary duty." The investigator concluded that Marcus was entitled to $3,883.14 in overtime back wages.

The DOL investigator communicated their findings to ACBL's counsel in October 2015. Counsel told the investigator that ACBL would not agree to pay any back wages because it disagreed that overtime was due to full-time salaried Tournament Directors. Counsel also said that ACBL was planning to discontinue the Tournament Director position and assured future compliance. The investigator "recommended that the file should be administratively closed." The investigation did not result in any monetary penalties or enforcement actions against ACBL.

### 3. Post-Investigation Exemption Status

In January 2017, ACBL began to classify full-time Tournament Directors as non-exempt. Field Supervisors remained exempt and ineligible for overtime pay. When ACBL reorganized its Field Operations team in 2018, the newly created positions of National Tournament Director, Associate National Tournament Director, Area Manager, and Mentor were all full-time exempt salaried positions.

### C. Marcus's Retaliation Claim

Marcus was first hired by ACBL in 1993 as a Tournament Director and, in 2001, he held the rank of associate national tournament director. In 2011, he began directing Sectional Tournaments at Clubs ("STaCs"), which allow players from various clubs to compete in a tournament even though the players are in different physical locations. When directing STaCs, Marcus

assisted -- by phone or email -- in directing games at the clubs, as well as compiling the results.

In June 2015, Marcus was promoted to the position of STaC Coordinator and his salary was increased. The STaC Coordinator position was salaried and ineligible for overtime. In Marcus's annual performance review for the period from January 1, 2015, to December 31, 2015, he received an overall rating of "Meets Expectations - 3," meaning the reviewer -- ACBL's Chief Executive Officer Robert Hartman -- found that his "[p]erformance consistently meets the standards of performance for [his] position and sometimes exceeds expectations." After the performance review, Marcus's salary was increased to approximately $893 per week.

Thereafter, in April 2016, Marcus applied for the open position of Director of Field Operations. Marcus interviewed for the position in June 2016; he was the only candidate interviewed at that time. ACBL's Human Resources Manager, Nancy Rosenbury, told Marcus that his interview had gone well, and sometime in mid-June Marcus met with Hartman to ask when a hiring decision would be made. Hartman apparently indicated that he expected "to make some decision in the near future." Marcus alleges that sometime thereafter Rosenbury called to inform him that he would not be hired as the Director of Field Operations due to "attitudinal concerns."

The following month, Marcus proposed to Hartman that he work as the Director of Field Operations on a trial basis. On August 9, 2016, Hartman informed Marcus that "[t]he executive team met [] and [] discussed your proposal. We are still considering the position. Whatever route we take, we decided not to bring anyone in on an interim or trial basis." Two days later, Hartman reached out to Marcus about a complaint he received about STaC scores not being timely posted. Marcus resigned, effective immediately, on August 12, 2016. Marcus testified that he felt frustrated and that there was no future for him at ACBL.

In April 2017, ACBL hired another individual as Director of Field Operations. That individual had no previous knowledge of bridge directing or bridge tournaments.

### III. Procedural History

#### A. Institution

Marcus filed the instant action on June 23, 2017, and filed an amended complaint on November 17, 2017. Marcus's suit alleged that ACBL failed to pay him and other similarly situated employees their FLSA-required overtime wages. Marcus also alleged that ACBL retaliated against him for lodging a complaint with the DOL, in violation of the FLSA. The district court conditionally certified the FLSA collective action, and notice was issued to potential class members. The district court ultimately recognized

Marcus, Matt Koltnow, and Dianne Barton-Paine as named plaintiffs, along with sixteen opt-in plaintiffs.

### B. Motion to Substitute

Kenneth Van Cleve, an opt-in plaintiff, died on July 9, 2019.  ACBL filed a notice of death on May 11, 2020.  On October 13, 2020, plaintiffs filed a motion to substitute his widow, Sarah Van Cleve, as a party to the lawsuit.  ACBL objected, arguing that the motion to substitute was untimely because plaintiffs failed to file it within 90 days after ACBL filed the notice of death as required by the Federal Rules of Civil Procedure.  The plaintiffs maintained that because ACBL did not serve the notice of death on Sarah Van Cleve, Kenneth's personal representative, the 90-day clock never started to run and, "[i]n the absence of a duly-served [n]otice of [d]eath, the [c]ourt is not constrained from considering the plaintiffs' timely motion to substitute."

The district court agreed with ACBL and denied the motion to substitute.  The court found that pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure, if a motion to substitute is not made within 90 days after service of a notice of death, the action must be dismissed.  As to plaintiffs' argument that ACBL was required to serve the notice of death upon Kenneth's personal representative, the court found that argument "without merit; the rule contains no such requirement."

## C. Summary Judgment Proceedings

In May 2020, the parties filed cross-motions for summary judgment.  ACBL and plaintiffs both moved for summary judgment on the unpaid overtime wages claims, and ACBL moved for summary judgment on Marcus's retaliation claim.

It is undisputed that plaintiffs satisfy the salary criterion of 29 C.F.R. § 541.200(a).  That left only two prongs of the administrative exemption test for the district court to consider: (1) whether the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (2) whether the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

The district court ultimately concluded that Tournament Directors are not subject to the administrative exemption because "the primary duty of Tournament Directors, which is officiating bridge contests, does not relate to the management or general business operations of ACBL, and [Tournament Directors] do not exercise discretion or independent judgment with respect to matters of significance."  Thus, the district court found that those plaintiffs who worked as "salaried Tournament Directors since April 24, 2017," were entitled to overtime pay.

As to the remaining positions (National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, and Mentors), the district court found that all these positions are subject to the administrative exemption. The district court concluded that the primary duty of these positions -- managing large tournaments and associated staff; training and mentoring other directors in making rulings and tournament scheduling; guiding disputes; and drafting and updating tournament regulations -- "go[es] beyond officiating individual contests and directly relate[s] to ACBL's management and general business operations" and "includes the exercise of discretion and independent judgment with respect to matters of significance." Thus, the district court found that those plaintiffs who worked as National Tournament Directors, Associate National Tournament Directors, Field Supervisors, Area Managers, or Mentors were not entitled to overtime pay.

Finally, the district court granted ACBL's motion for summary judgment as to Marcus's retaliation claim. The court found that "Marcus ha[d] failed to put forth evidence from which a reasonable factfinder could infer that [ACBL] did not promote him because of his November 2014 complaint" to the DOL. This appeal followed.

## IV. Standard of Review

We review the entry of summary judgment de novo. <u>See</u> <u>Walsh</u> v. <u>Unitil Serv. Corp.</u>, 64 F.4th 1, 5 (1st Cir. 2023). "Cross-motions for summary judgment do not alter the basic . . . standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Alasaad</u> v. <u>Mayorkas</u>, 988 F.3d 8, 16 (1st Cir. 2021), <u>cert. denied sub nom.</u>, <u>Merchant</u> v. <u>Mayorkas</u>, 141 S. Ct. 2858 (2021) (quoting <u>Adria Int'l Grp., Inc.</u> v. <u>Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001)).

Because the district court's ruling on the motion to substitute a party turned on a question about the interpretation of Rule 25 itself, that ruling requires de novo review. <u>See</u> <u>Comfort</u> v. <u>Lynn Sch. Comm.</u>, 560 F.3d 22, 25 (1st Cir. 2009) (employing de novo review "about the meaning or interpretation" of a Federal Rule of Civil Procedure); <u>see also</u> <u>Barlow</u> v. <u>Ground</u>, 39 F.3d 231, 233 (9th Cir. 1994) ("The proper interpretation of Rule 25(a) is a question of law that we review de novo.").

We begin with the motion to substitute a party, then move to Marcus's retaliation claim, and end on the overtime wages claims.

## V. Analysis

### A. Motion to Substitute a Party

The parties dispute whether ACBL was required to serve the statement noting death upon Kenneth Van Cleve's successor or representative. If a claim survives the death of a party, Rule 25 "facilitates the substitution of a 'proper party' to take the place of the decedent." Silas v. Sheriff of Broward Cnty., 55 F.4th 872, 876 (11th Cir. 2022) (quoting Fed. R. Civ. P. 25(a)(1)). The rule requires "service of a statement noting the death," but fails to specify upon who that notice must be served. Fed. R. Civ. P. 25(a)(1). However, who, exactly, must be served is an important facet of the rule because "[i]f the motion [to substitute a party] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Id.

We have not yet had occasion to address whether the statement of the fact of death must be served upon the decedent's successor or personal representative before the 90-day clock starts to run. Several of our sister circuits have considered this issue and concluded that service of the notice of death upon nonparty successors or representatives of the deceased party is required to commence the 90-day substitution period. See Silas, 55 F.4th at 876; Sampson v. ASC Indus., 780 F.3d 679, 681-82 (5th Cir. 2015); Atkins v. City of Chicago, 547 F.3d 869, 873 (7th Cir.

2008); <u>Barlow</u>, 39 F.3d at 234; <u>Gilmore</u> v. <u>Lockard</u>, 936 F.3d 857, 866 (9th Cir. 2019); <u>Grandbouche</u> v. <u>Lovell</u>, 913 F.2d 835, 837 (10th Cir. 1990); <u>Bass</u> v. <u>Attardi</u>, 868 F.2d 45, 50 n.12 (3d Cir. 1989); <u>Farris</u> v. <u>Lynchburg Foundry</u>, 769 F.2d 958, 962 (4th Cir. 1985). This conclusion is supported by both the language and purpose of the rule.

Rule 25(a)(3) plainly requires that the statement noting death "must be served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4."  The only nonparties mentioned in Rule 25 are "the decedent's successor or representative."  Fed. R. Civ. P. 25(a)(1).  As such, it would be superfluous for the rule to provide that nonparties must be served under Rule 4 if service upon a decedent's successor or personal representative was not required.  <u>See</u> <u>United States</u> v. <u>Walker</u>, 665 F.3d 212, 228 (1st Cir. 2011) (noting that "[g]reat weight must be given to the plain language of [a] rule" of federal procedure).

Moreover, when Rule 25(a)(1) was last substantively amended in 1963, the Advisory Committee noted that the intent of the amended rule was to establish "a time limit for the motion to substitute based not upon the time of the death, but rather upon the time information of the death is provided by means of a suggestion of death upon the record, i.e.[,] service of a statement of the fact of death."  Fed. R. Civ. P. 25 advisory committee's note to 1963 amendment.  It is clear to us that "information of

the death" must be provided to nonparty successors or representatives in order to empower them to take appropriate "action to preserve the claim if so desired." Fariss, 769 F.2d at 962.

The import of this requirement is most apparent where, as here, the "opposing party, to start the 90-day clock, filed the suggestion of death." Atkins, 547 F.3d at 873. Service of the suggestion of death upon the decedent's successor or personal representative "alerts [them] to the consequences of death for a pending suit." Fariss, 967 F.2d at 962. The function of "[t]he 90[-]day period [is] not intended to act as a bar to otherwise meritorious actions." Rende v. Kay, 415 F.2d 983, 986 (D.C. Cir. 1969) (quoting Staggers v. Otto Gerdau Co., 359 F.2d 292, 296 (2d Cir. 1966)). As such, "where a party files a suggestion of death, it must do so in a manner that puts all interested parties and nonparties on notice of their claims in order to trigger the 90-day window." Gilmore, 936 F.3d at 866-67.

It appears that, of the circuits to have considered this precise issue, only the Second Circuit has concluded that under Rule 25(a)(1) the 90-day deadline for a party to move to substitute is triggered by the proper service of a notice of death upon the parties, "regardless of whether that notice was also served upon the decedent's successor or representative." Kotler v. Jubert, 986 F.3d 147, 150 (2d Cir. 2021), cert. denied, 142 S. Ct. 598

(2021).  However, the <u>Kotler</u> court recognized that the facts of the case before it did not arise from the posture of a "deceased plaintiff's representative who, having <u>never</u> received service of a notice of death, attempts to revive the deceased plaintiff's dismissed lawsuit."  <u>Id.</u> at 154 (emphasis in original).  And that is exactly the case we have here: Sarah Van Cleve was not served with the notice of death, and she attempted to revive Kenneth's claims by moving to substitute.  There is no indication that Sarah Van Cleve "actually received notice . . . and sat on h[er] hands while the 90-day window lapsed."  <u>Id.</u>

In sum, we hold that in order for the 90-day clock to begin running under Rule 25, the suggesting party must properly serve <u>both</u> the other parties and a nonparty successor or personal representative of the deceased with a notice of death.  Because ACBL failed to serve Kenneth Van Cleve's successor with the notice of death, the 90-day period to move to substitute was never triggered.  Thus, the district court erred in denying the motion to substitute Sarah Van Cleve.

### B. Retaliation

We next turn to whether the district court properly granted summary judgment in favor of ACBL on Marcus's retaliation claim.  The FLSA prohibits employers from retaliating against "any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or

related to" the FLSA.  29 U.S.C. § 215(a)(3).  Employees mounting
an unlawful retaliation claim "must prove (1) that they 'engaged
in statutorily protected activity' and (2) that their employers
afterward took 'adverse employment action' against them (3) 'as
reprisal for having engaged in the protected activity.'"  Uphoff
Figueroa v. Alejandro, 597 F.3d 423, 431 (1st Cir. 2010) (quoting
Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102
(1st Cir. 2004)).[2]

          The parties do not dispute that the first part of this
test is met -- i.e., that Marcus engaged in statutorily protected
activity when he filed a complaint with the DOL -- and the district
court assumed that ACBL's "decision not to promote Marcus to
Director of Field Operations constitutes an adverse employment
action."  Thus, the case turns on whether the record -- read in
the light most favorable to Marcus -- "suffices to support an
inference as to whether retaliatory animus was the 'true reason or
motive' for" Marcus not being promoted.  Kearney v. Town of
Wareham, 316 F.3d 18, 23 (1st Cir. 2002) (quoting Hoeppner v.
Crotched Mtn. Rehab. Ctr., 31 F.3d 9, 14 (1st Cir. 1994)).

---

          [2] We have held before that "Title VII, ADEA, ERISA, and FLSA
[] stand[] in pari passau," and that "judicial precedents
interpreting one such statute [are] instructive in decisions
involving another."  Serapion v. Martinez, 119 F.3d 982, 985 (1st
Cir. 1997).  Thus, we sometimes draw on precedents developed in
other types of discrimination cases.

We begin with the temporal proximity between the DOL complaint and ACBL's decision not to promote Marcus. Marcus maintains that "the timing" of the DOL complaint and ACBL's decision not to promote him to Director of Field Operations contributes to the requisite causal connection showing. "[T]emporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) (quoting Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007)).

The parties set forth different milestones from which to measure temporal proximity. Marcus maintains that the relevant time span is October 2015 -- when he alleges ACBL learned of the DOL complaint -- to July 2016 -- when he was denied the position of Director of Field Operations. Accepting Marcus's shortest proposed timeline, the time between ACBL's knowledge of the protected activity and the adverse employment action is nine months, but "a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action." Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010).

However, Marcus does not only rely on the timing of the employment actions as his evidence of causal connection. Indeed, "'temporal proximity' is merely one factor relevant to causation,"

Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 25 (1st Cir.
2014), and, where it is lacking, an inference of causation can be
"reinforced by other evidence in the record." Trainor v. HEI
Hosp., LLC, 699 F.3d 19, 28 (1st Cir. 2012). The "other evidence"
Marcus fastens on to show that ACBL's decision to not promote him
to Director of Field Operations was motivated by retaliatory animus
is that he was the only applicant interviewed for the position
and, thus he presumes, the only qualified applicant, and that ACBL
ultimately filled the position with someone Marcus believes was
"far less qualified than" himself. Marcus also relies on purported
statements made by ACBL's Human Resources Manager that he was not
promoted due to "attitudinal" concerns.

We begin with Marcus's latter argument. He maintains
that Rosenbury informed him that even though his interview had
gone well, he would not be hired as the Director of Field
Operations due to "attitudinal concerns." However, Marcus
testified under oath that Rosenbury "did not use that word for
sure because that's [his] word, not hers." "It is well-settled
that a judge must not engage in making credibility determinations
or weighing evidence at the summary judgment stage, but it is
equally clear that judges cannot allow conjecture to substitute
for the evidence necessary to survive summary judgment." Pina v.
Children's Place, 740 F.3d 785, 802 (1st Cir. 2014) (internal
citations omitted). As such, Marcus cannot rely on his speculative

and unsupported assertion of why ACBL did not hire him for the position when he readily admits that he "d[id] not remember [Rosenbury's] words." See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (noting that when reviewing the entry of summary judgment, we will not "credit bald assertions, empty conclusions, [or] rank conjecture").

We next turn to the fact that ACBL only interviewed Marcus for the position but ultimately hired someone who had very limited experience with the game of bridge. The record reflects that after Marcus filed the DOL complaint, ACBL promoted him, raised his pay, and gave him a positive performance evaluation. Moreover, ACBL hired another individual as the Director of Field Operations eight months after Marcus voluntarily resigned, and Hartman testified that this individual "had a lot of experience in [] many kinds of casino-type of environment[s]" and "gave a fresh perspective to the organization." Marcus has not produced any evidence that ACBL's stated reasons for denying him the position of Director of Field Operations were pretextual.

We end with one additional argument advanced by Marcus: that "Hartman harbored animus against Marcus for having initiated a complaint . . ., and that the fruit of that animus was the decision to deny Marcus a promotion." In furtherance of this argument, Marcus contends that Hartman lied in claiming that he did not remember Marcus applying for the position of Director of

Field Operations, and that a reasonable jury could find this omission was pretext for Hartman's retaliatory motive. However, to draw an inference of causation "there must be proof that the decisionmaker knew of the plaintiff's protected conduct when [they] decided to take the adverse employment action." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 (1st Cir. 2006). A reasonable juror could not, on this record, find that Hartman knew about Marcus's protected activity.

The only evidence Marcus points to is that in November 2015 a DOL investigator told ACBL's legal counsel that Marcus was owed overtime wages as a result of an audit. Marcus does not point to any evidence that ACBL's counsel told Hartman -- or anyone at ACBL for that matter -- about the overtime wages due, or that counsel even adduced that Marcus was the one who filed the DOL Complaint. Marcus does not contest this lack of evidence and does not dispute that he "has no evidence [that Hartman knew he was the one who filed the DOL complaint] other than his knowledge that he informed the [DOL] that they had his permission to use his name." Accordingly, any purported incredible testimony given by Hartman is not probative of retaliation because there is no evidence in the record from which a reasonable juror could infer that Hartman knew about Marcus's protected activity.

In short, based on the record before us, we can find no evidence of a causal connection between Marcus's filing of the DOL

complaint and ACBL's decision not to promote him to Director of Field Operations.  We therefore affirm the district court's entry of summary judgment in favor of ACBL on Marcus's retaliation claim.

## C. Administrative Exemption

Finally, we consider whether the district court properly classified the various positions at issue pursuant to the FLSA and the administrative exemption.  As we previously stated, the parties do not dispute that the first prong of the administrative exemption is met (sufficient compensation requirement) for all of the positions.  Rather, the disputes turn on the second prong (primary duty is the performance of office or non-manual work directly related to management or general business operations) and third prong (primary duty includes the exercise of discretion and independent judgment with respect to matters of significance).

### 1. Tournament Directors

We begin with whether the Tournament Directors' primary duty is "directly related" to the management or general business operations of ACBL.  As we recently noted, "it is often useful to [first] identify and articulate the business purpose of the employer."  Walsh, 64 F.4th at 6.  ACBL is in the business of serving its members by annually "sanction[ing] over 3.5 million tables of bridge, played in more than 3,000 bridge clubs and 1,100 sectional and regional tournaments, plus 1 million tables played online."  Providing Tournament Directors for contract bridge

tournaments sanctioned by ACBL represents ACBL's largest source of revenue besides membership dues.

The primary duty of Tournament Directors is to "supervise a duplicate bridge contest." This work, when considered in relation to ACBL's business purpose, is the very service that ACBL is in the business of providing. Therefore, because Tournament Directors "provide the service that [ACBL] is in business to provide, the second prong is not satisfied." Walsh, 64 F.4th at 7; see Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) (noting that "employees directly producing the good or service that is the primary output of a business" do not perform administrative work). The district court thus correctly concluded that Tournament Directors are not subject to the administrative exemption under the FLSA.

### 2. National Tournament Directors and Associate National Tournament Directors

Like Tournament Directors, the primary duty of National and Associate National Tournament Directors is to supervise bridge tournaments. They are required to work around 300 tournament sessions each year. And, although they may have additional duties such as training and mentoring other directors in tournament-related areas, guiding disputes concerning game play, and/or drafting tournament regulations, these duties all go towards producing an ACBL-sanctioned bridge tournament. National

and Associate National Tournament Directors' responsibilities begin and end with the tournament they are working on. There is no evidence in the record that National and Associate National Tournament Directors are part of the management structure of ACBL or that they assist "with the running or servicing of the business." 29 C.F.R. § 541.201(a).

National Tournament Directors and Associate National Tournament Directors produce the key product of ACBL-sanctioned bridge tournaments. Given the nature of ACBL's business, their primary duties amount to production work. See Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 694-95 (4th Cir. 2009) (holding that horse racetrack officials who observed and examined horses and jockeys, filled out relevant paperwork for the horses and order of finish for the race, and dealt with subsequent claims were not administrative employees because they performed tasks to produce the very product their employer offered to the public). They did not perform "work directly related to [ACBL's] management or general business operations." 29 C.F.R. § 541.200(a)(2).

We need not address whether their work met the additional administrative exemption requirement of "includ[ing] the exercise of discretion and independent judgment with respect to matters of significance." Id. at § 541.200(a)(3). Both requirements must be met for the exemption to apply. Because ACBL has failed to show that the FLSA's administrative exemption applies to National

Tournament Directors and Associate National Tournament Directors, the district court erred in granting summary judgment in favor of ACBL and in denying summary judgment to the corresponding plaintiffs.

### 3. Field Supervisors and Area Managers

Unlike the preceding positions, Field Supervisors and Area Managers meet both outstanding requirements of the administrative exemption. Despite plaintiffs' argument to the contrary, we do not agree that the primary duty of Field Supervisors and Area Managers is directing tournaments. These employees may spend approximately 75 percent of their time tournament directing, but "the character of the employee's job as a whole" reveals that their primary duty does, in fact, relate to ACBL's management or general business operations. 29 C.F.R. § 541.200(a)(2).

The duty of these employees goes beyond producing ACBL-sanctioned bridge tournaments and instead requires them to do "work directly related to the management or general business operations of" ACBL. 29 C.F.R. § 541.200(a)(2). Field Supervisors and Area Managers focus on "(1) tournament organization . . . (2) workforce supervision (3) tournament operations, and (4) executing the strategic direction of field operations." They are expected to develop, implement, and manage strategic and long-term processes and programs, including tournament planning/review and

plans to maintain standards of player satisfaction. The processes and programs directly relate to the running of ACBL and are significant to ACBL because they are designed to ensure the long-term integrity of bridge tournaments and satisfaction of ACBL's consumers. See Hines v. State Room, Inc., 665 F.3d 235, 243 (1st Cir. 2011) (working to "establish long-term relationships, to keep clients happy and to maintain the overall reputation of their employer[]" directly relates to management or general business operations). And, as the very developers of the plans, Field Supervisors and Area Managers "exercise discretion and independent judgment." 29 C.F.R. § 541.200(a)(3); see also id. § 541.202(b).

While directing tournaments, Field Supervisors and Area Managers were also expected to be the "[f]irst point of contact for issues related to tournament operations and staff" and to "[e]stablish and maintain effective relationships with tournament sponsors." These high-level customer service-oriented responsibilities also directly relate to ACBL's business operations. See Cash v. Cycle Craft Co., Inc., 508 F.3d 680, 686 (1st Cir. 2007) (finding that an employee who "focused on improving customer service" and satisfaction fell within administrative exemption).

Beyond these long-term goals, Field Supervisors and Area Managers also had significant supervisory authority over other

employees, including writing annual performance reviews and making hiring/firing decisions.  "The supervision of other employees is clearly a management duty," Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982), and it involves the exercise of discretion and independent judgment because the employment decisions made by Field Supervisors and Area Managers "affect[] business operations to a substantial degree," "commit [ACBL] in matters that have significant financial impact," and "bind [ACBL] on significant matters."  29 C.F.R. § 541.202(b).

Accordingly, all prongs of the administrative exemption are satisfied with respect to Field Supervisors and Area Managers. We therefore affirm the district court's grant of summary judgment in favor of ACBL with respect to the FLSA exemption status of Field Supervisors and Area Managers.

### 4. Mentors

This brings us to the final disputed position of Mentors. Each Mentor reported directly to an Area Manager and was "responsible for (1) workforce recruitment; (2) workforce supervision and development; and (3) tournament operations." Mentors answered Tournament Directors' questions, checked their hours, and gave performance reviews.  In so doing, Mentors "engaged in something more than routine" tournament directing.  Cash, 508 F.3d at 686 (quoting Reich, 126 F.3d at 10).  Instead, Mentors helped run ACBL's business by recruiting, supervising, and setting

standards for Tournament Directors.  See Reich, 126 F.3d at 10 (holding that "representing the company" qualified as administrative work).

Mentors exercised discretion and independent judgment with respect to matters of significance because "higher-level managers generally deferred to" their recommendations "as to important employment decisions."  See 29 C.F.R. § 541.202(c) ("[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.").  Accordingly, all prongs of the administrative exemption are satisfied with respect to Mentors.

## VI. Conclusion

For the foregoing reasons, we reverse the district court's order denying plaintiffs' motion to substitute a party; affirm the district court's judgment in favor of ACBL on Marcus's retaliation claim; reverse the district court's judgment with respect to the FLSA overtime claims of National Tournament Directors and Associate National Tournament Directors; affirm the district court's judgment in all other regards; and remand this case to the district court for any further proceedings consistent with this opinion.  Each party shall bear its own costs on appeal.